[No. G034074. Fourth Dist., Div. Three. Sept. 30, 2005.]

MANDEEP BEHNIWAL et al., Plaintiffs and Appellants, v.
GENE C. MIX et al., Defendants and Respondents.

COUNSEL

Law Offices of Barry A. Ross and Barry A. Ross for Plaintiffs and Appellants.

Law Offices of Michael G. York and Michael G. York for Defendants and Respondents Gene and Jo Anne Mix.

Maxie Rheinheimer Stephens & Vrevich, Darin L. Wessel and Jane Rheinheimer for Defendants and Respondents Prudential California Realty and Kim Seidenberg.

## OPINION

**SILLS, P. J.**—This is a statute of frauds case with attendant fallout involving attorney fees. It involves two appeals: one by the disappointed would-be buyers of an Irvine condo, Mandeep and Amandeep Behniwal, asserting that the trial court should have granted them specific performance; the other by the seller's agent and her realty company challenging attorney fees assessed against them at the conclusion of the litigation. Ironically, the fee award is in favor of the losers in their quest for specific performance, the Behniwals.

Both appeals will result in reversals of the relevant portions of the judgment. On the statute of frauds problem, let us cut to the chase: There is no question that there was, in substance, a deal between the owners of the condo, Gene C. and Jo Anne Mix, and the Behniwals, to sell the condo for $540,000. Both parties acted like there was such a contract until Gene Mix manifested some health problems, prompting the Mixes to want out of the deal. (This is the version adopted by the trial court. A more cynical version has been proffered by the Behniwals, namely that the Mixes wanted out when they received a backup offer for $565,000 and knew they could get at least $25,000 more for the property.) In fact, the trial court specifically found:

(1) Mrs. Mix had orally authorized the Mixes' agent to sign the basic papers[1];

(2) the Mixes knew there was an agreement to sell the property[2]; and

(3) the Mixes' actions had misled the Behniwals into thinking they had purchased the condominium.[3]

Despite an obvious inclination based on its findings to grant the Behniwals' request for specific performance, the trial court felt compelled to deny the request. Basically, the trial court concluded, as matters of law, (1) no contract had been formed because a paragraph in a counteroffer made by the sellers' agent had not been re-signed as contemplated by the counteroffer itself; and (2) there was no writing on the sellers' part ratifying their agent's actions (including forgeries of their signatures on the offer, counteroffer and an addendum to the counteroffer).

In the process, the trial court apparently concluded that both of the Mixes' signatures on a series of disclosure statements—signed after an escrow had been opened, and referencing "the" transaction—were insufficient to ratify the transaction. On that issue we have reached a different conclusion. The Mixes' signatures did indeed ratify the actions of their agent in entering into the transaction. We will therefore reverse the trial court's denial of the Behniwal's request for specific performance.

Our decision on the specific performance issue has its necessary effects on the attorney fee award in favor of the Behniwals against the Mixes' agent and the agent's company. The judgment requires the agent and the agent's company to pay the Behniwals the money the Behniwals must pay to the Mixes because the Mixes won the case. In the wake of the reversal of the decision on the specific performance issue this part of the award obviously cannot stand. The Behniwals are the new winners. They will now be entitled to seek from the Mixes at least all the fees otherwise awarded them from the agent and the agent's company.

The judgment also provides that the agent and the agent's company pay the Behniwals the money the Behniwals incurred to press their (hitherto unsuccessful) specific performance action. The theory was that the Behniwals

---

[1] To quote from the statement of decision of February 2, 2004: "The Court disbelieves Mrs. Mix' testimony that she hadn't authorized, at least verbally, the agent Seidenberg to sign the papers."

[2] From the same statement of decision: "The Court rejects the Mix's contention they didn't think there was any sort of agreement to sell their property, and finds their testimony disingenuous in that regard."

[3] And again: "But, there is no question in the Court's mind that the defendants' actions mislead the plaintiffs into believing they had purchased the condominium."

incurred these attorney fees because of the "tort of another," i.e., the Mixes' agent. But this award came after the court's ruling that the Behniwals were not entitled to specific performance, hence was predicated on the idea that the Behniwals would not be entitled in their own right to obtain their fees from the Mixes on the contract. Moreover, the award was predicated on the idea that the Behniwals had sustained damages because they couldn't get specific performance because of the tort of the agent and her company. All that is now changed—they do get specific performance; there was no tort on which to predicate recovery of fees against the agent and her company. In light of our decision that the Behniwals are entitled to specific performance, the matter of their fees must necessarily be returned to the trial court for further proceedings.

## I. FACTS

On June 7, 2002, Gene and Jo Anne Mix listed their Irvine condo for sale with Kim Seidenberg, a Prudential California Realty agent. The Behniwals had their own buyers' agent, Nancy Ghorbanian. On June 18, the Mixes arranged for a termite inspection of the property.

On June 27, 2002, the Behniwals presented an offer on a California Association of Realtors form entitled residential purchase agreement and joint escrow instructions and receipt for deposit ("residential purchase agreement" for short)[4] for $520,000. The Mixes did not accept the offer. However, their agent Seidenberg prepared a counteroffer on a California Association of Realtors counteroffer form.[5] It is undisputed that the counteroffer was not actually signed by either of the Mixes; rather, sellers' agent Seidenberg signed their names to the document at that spot on the document.

The counteroffer requires some elaboration. It wasn't just the Behniwals who made an offer on the Mixes' property. Another couple, the Bestanis, also made an offer about the same time—this one for $500,000 ($20,000 lower than the Behniwals' $520,000). So Seidenberg sent identical counteroffers to both the Behniwals and the Bestanis.

---

[4] For readability's sake, all quotations from such documents in the record that are in all caps will be converted to normal capitalization and all quotations that are in boldface type will be converted to regular type.

[5] That characterization is the essence of the following: Item 33 of the residential purchase agreement and joint escrow instructions form is headed, "Acceptance of offer: Seller warrants that Seller is the owner of this Property or has the authority to execute this Agreement. Seller accepts the above offer, agrees to sell the Property on the above terms and conditions, and agrees to the above confirmation of agency relationships. Seller has read and acknowledges receipt of a Copy of this Agreement, and authorizes Broker to deliver a Signed Copy to Buyer." Beneath this text is a box, and by the box is language which says: "(If checked) Subject to attached counteroffer, dated" and then there is a line to fill in the date of the counteroffer. In our record, the box is checked, and the blank is filled in with 6-27-02.

The counteroffer itself was a one-page document. It sought an increase in price to $540,000 and several changes of other terms. Four provisions are relevant to this case, so we will now describe them.

Item 3, expiration, provided: "Expiration. Unless acceptance of this Counter Offer is Signed by the Buyer or Seller to whom it is sent, and communication of acceptance is made by delivering a Signed Copy, which is personally received, to the person making this Counter Offer or to [then there is a blank, with the name of the sellers' agent, Kim Seidenberg written in, in what looks to be her handwriting] by 5:00 PM on the third calendar day after this Counter Offer is written or, if checked [and the box next *is* checked] date: [and then follows line, with the date "June 28th, 2002" written in], time ["5:00 PM" is written in], this Counter Offer shall be deemed revoked and the deposit shall be returned to the Buyer. This Counter Offer may be executed in counterparts."

Item 4, multiple counteroffer, provided: "(If checked:) [and the box immediately to the left of those words which begins item 4 is checked] Multiple Counter Offer: Seller is making a Counter Offer(s) to another prospective buyer(s) on terms that may or may not be the same as in the Counter Offer. Acceptance of this Counter Offer by Buyer shall not be binding unless and until it is subsequently re-Signed by Seller in paragraph 7 below and communication of Seller's acceptance is made by delivering a Signed Copy, in person, by mail or by facsimile, which is personally received, to Buyer or to [then there is a blank with a line where nothing is filled in]. Prior to the completion of all these events, Buyer and Seller shall have no duties or obligations for the purchase of sale of the Property."

In that regard, item 7, multiple counteroffer signature line (just referenced in item 4 above) provided: "Multiple Counter Offer Signature Line: By signing below, Seller accepts this Multiple Counter Offer. Note to Seller: Do not sign in this box until after Buyer signed in paragraph 6.) (Paragraph 7 applies only if paragraph 4 is checked.)" Then follows two lines for signatures, dates and times. Both are left blank.

Finally, item 6 referenced in item 7, provides: "Acceptance: I/we accept the above Counter Officer (if checked [and the box next is *not* checked] subject to the attached counteroffer) and acknowledge receipt of a Copy." And then follows two lines which *were* signed, on June 28, 2002, by each of the Behniwals.

An "Addendum to Counter Offer # 1" dated June 28, 2002 (involving, if you look up the items referenced, the time for the loan contingency) was

ostensibly signed by both the Mixes and the Behniwals, but it is undisputed that the Mixes did not sign the document. Their agent "forged" their signatures.

The Mixes would assert in trial that they did not learn that Seidenberg had signed their names to the offer, counteroffer, and addendum until the latter part of August, but, as noted above, the trial court did not believe them. Of course, the *Behniwals*, as innocent buyers, were certainly unaware that Seidenberg had signed the Mixes' names.

The Behniwals' competitors for the property, the Bestanis, never responded to the counteroffer.

Despite the fact that the Mixes hadn't signed the offer, hadn't signed the counteroffer (particularly with its necessity of re-signing in item 7), and hadn't signed the addendum, they still *intended* to sell their property to the Behniwals for $540,000, and admitted so at trial.[6]

And so, an escrow "was opened" (the passive voice was chosen by the parties in their own joint stipulation of facts, though in our prior opinion we noted that Seidenberg had done the opening). In any event, the Mixes understood an escrow had indeed been opened. In fact, Jo Anne Mix sent a handwritten letter asking for a 30-day extension of an escrow opened in connection with the Behniwal transaction.

In connection with that escrow the Mixes signed a series of disclosure forms.

The "Data Base Disclosure" form regarding registered sex offenders, signed by the Mixes on July 3 (the handwriting being distinctly different from that on the "forged" offer, counteroffer, and addendum), begins with these words: "The following terms and conditions are hereby incorporated in and made a part of the" and then there is a checked box, followed by the words "Residential Purchase Agreement and Receipt for Deposit" and "Gene and Joanne Mix" are expressly referred to as Seller.

A real estate transfer disclosure statement contained a provision under "Substituted Disclosures" saying, "The following disclosures have or will be made in connection with this real estate transfer . . . ."

Both of the Mixes also signed a natural hazard disclosure statement, an agent's inspection disclosure, a seller's affidavit of nonforeign status and/or

---

[6] "Q. [of Mrs. Mix] You said that you decided in the beginning to sell the house to the Behniwals; is that right? A. As per telephone conversations with Kim Seidenberg, yes. Q. Okay. And what was the price that you agreed to sell? A. It was at 540,000."

California residency, a water heater statement of compliance, and a smoke detector statement of compliance. The smoke detector statement of compliance also made reference to escrow. ("Seller represents that the Property, as of the close of escrow, will be in compliance with Health and Safety Code § 13113.8 by having operable smoke detector(s) . . . installed . . . .")

Five days later, on July 8, 2002, Gene Mix was taken to an emergency room. (Mix was in his late 70's in 2002.) At that point the Mixes decided that because of Gene Mix's health they did not want to sell their home. They communicated their change of mind to Seidenberg's stand-in Gary Hesselgesser the next day (Seidenberg was on vacation at the time), but Hesselgesser—granted, still thinking that the signatures on the offer and counteroffer were theirs—told them they had to sell their home.

As alluded to above, there is an alternative version of their change of mind, worth noting, but not adopted by the trial court. On July 3 a real estate broker named Sebastian Naum came by with an offer for $565,000. The Mixes considered this a "backup" offer and in fact tore up the deposit check. The trial court, in its statement of decision, specifically found that Gene Mix's health problems were the reason that they would eventually cancel the escrow.[7]

Nine days after that, on July 18, Jo Anne Mix hand wrote a letter to "Kim" (obviously Seidenberg) stating: "Gene and I accept escrow to be extended for six months. [¶] We will continue to make our monthly house payments and all other obligations such as taxes asso. and insurance while we occupy the house for six months. [¶] We will vacate at the close of escrow plus 3. [¶] If possible, we will ask to close escrow sooner."

However, on August 13, 2002, both Mixes signed this handwritten note to close escrow: "To whom it may concern, [¶] Please cancel our escrow because [of] health reasons. [¶] 2-3631 38 Valley View [¶] Irvine, Ca. 92612."

This litigation followed. In mid-October 2002 the Behniwals filed a complaint against the Mixes for specific performance, breach of contract and declaratory relief. That prompted the Mixes to file a cross-complaint for damages (basically for indemnity) against Seidenberg and Prudential in

---

[7] To quote from the statement of decision: "In Exhibit 8, the handwritten note of August 13, Mrs. Mix purports to cancel the escrow 'because of health reasons.' It was clear to the Court at trial, that Mr. Mix did have, and continues to have health problems. He appeared at times to have difficulty sitting through proceedings, and testifying. The Court believes the Mixes were truthful in stating that as a reason to 'cancel' the escrow."

February 2003, and in May 2003 the Behniwals upped the ante by filing their own cross-complaint for damages (based on fraud) against Seidenberg and Prudential.

The proceedings were bifurcated.

First there was a court trial on the Behniwals' action for specific performance. As noted above, the trial court's statement of decision was not particularly complimentary to the Mixes.[8] Even so, the court ruled the Behniwals were not entitled to specific performance, for these reasons:

(1) There was no authorization from Gene Mix for Seidenberg to sign his name to the offer, counteroffer, and addendum.

(2) There was no sufficient ratification of the deal in writing.

(3) The Mixes were not estopped from claiming no contract exits. (For what is it worth, the Behniwals do *not* argue estoppel in their opening brief in this appeal.)

(4) The Behniwals' action was indeed barred by the statute of frauds and the fact that the agent (Seidenberg) did not have written authority to bind the Mixes.

(5) And most of all, because the language in item 4 of the counteroffer, requiring item 7 to be signed, was clear, and the buyers' agent certainly was on notice of its absence.

On the question of whether either the Behniwals or the Mixes could recover damages from Seidenberg and Prudential, the court decided: "This is a question for the jury."

And so there was a jury trial on the claims of both the Mixes and the Behniwals against Seidenberg and Prudential for attorney fees.

The Mixes lost their part. The jury found in *favor* of Seidenberg and Prudential, and the Mixes have not appealed from the portion of the ensuing judgment denying them relief.

---

[8] "The only witnesses who carried much credibility with the Court were the plaintiff, the Behniwals . . . . [¶] The Court rejects the Mix's contention they didn't think there was any sort of agreement to sell their property, and finds their testimony disingenuous in that regard . . . . [¶] there is no question in the Court's mind that the defendants' actions mislead the plaintiffs into believing they had purchased the condominium."

But the Behniwals prevailed on their part. That meant they got their deposit back, their escrow expenses of $350, and two varieties of attorney fees from Seidenberg and Prudential: (1) Fees and costs incurred in the action itself, and (2) fees and costs that they may owe the Mixes as a result of the action (i.e., because they were the losing party). In each case, the judgment provided that the fees would be fixed later, by motion.

In regard to (2), the Mixes, having won their battle with the Behniwals, filed their own motion for attorney fees against them (i.e., against Seidenberg and Prudential). The Mixes got $63,521.25 pursuant to the real estate contract, which the court specifically noted in its minute order would be "recoverable by the Behniwals as against Prudential."

As to (1), the Behniwals' quest for fees against Seidenberg and Prudential, i.e., their fees on the specific performance action, the court awarded $106,050, which did *not* include the $34,305 in fees that the Behniwals incurred in the "jury trial portion" of the case, i.e., fees incurred pursuing Seidenberg and Prudential for more fees.

The grand total of fees that the court's minute orders contemplated Seidenberg and Prudential paying the Behniwals was thus $169,571.25 ($63,521.25 plus $106,050). The sum was embodied in a formal order filed July 15, 2004.

The Behniwals timely appealed from the judgment and Seidenberg and Prudential have timely appealed from the formal postjudgment order awarding fees.

## II.   THE BEHNIWALS' APPEAL

### A.   The Proper Interpretation of the Language in the Counteroffer

Threading through the case requires that we bear in mind the differences between the statute of frauds as it relates to *contract formation* and the problem of ratification as it relates to the authority of an *agent* to enter into a contract on behalf of her principals.

Obviously we must deal with the contract formation issue first. Much of the Mixes' argument centers on the idea that there never was any contract in the first place, and if they are correct, then the Mixes really had nothing to ratify. Indeed, the trial court seems to have been most influenced by the contract formation issue, given the court's reference to the unsigned item 7 in the counteroffer. So let's start there first.

Item 7 cannot be read in isolation or a vacuum. (See, e.g., Civ. Code, § 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."]; *id.*, § 1650 ["Particular clauses of a contract are subordinate to its general intent."].) It must be taken together with the other documents in the transaction, in light of its evident purpose.

The evident purpose of item 7 of the counteroffer, with its requirement of *re*-signing the counteroffer by the sellers, is revealed in paragraph 4—to show that the Mixes were choosing the acceptance of the counteroffer in preference to any other counteroffers that the Mixes might have received from other prospective buyers. The re-signature was necessary to show which, if any, of the acceptances of the counteroffer from prospective buyers, including the Behniwals, would be "accepted" by the sellers.

So, granted, on July 28, when the Behniwals and not the Bestanis returned the counteroffer by the 5:00 p.m. deadline, the Mixes were still free not to enter into a deal.

But then came the addendum of the next day, which directly referenced an item in the counteroffer (item C3[9]), which itself referenced an item in the original offer[10] concerning loan contingencies. The addendum also directly referenced another item in the original offer (item 2I[11]) contemplating all cash offers, asking that it be voided "since this is not an all cash offer."

With their agent signing their signatures on the addendum there was a contract, because the act of Seidenberg, as agent, in signing the Mixes' names to the addendum was the functional equivalent of the designation of which, if any, returned counteroffers would be accepted contemplated by the need for re-signatures required in item 7 of the counteroffer. That is, their agent's signing their signatures on the addendum showed an acceptance of the particular offer of the Behniwals embodied in the so-called counteroffer that the Behniwals had already "accepted" (perhaps the better term would be "presented") by the Behniwals signing the "counteroffer" by the 5:00 p.m.

---

[9] The language in the counteroffer was: "Item 2G to be within 14 days of acceptance."

[10] Item 2G in the original offer provides in pertinent part: "Loan contingency shall remain in effect until the designated loans are funded (or [and then there is a box, not checked] Days after Acceptance, by which time Buyer shall give Seller written notice of Buyer's election to cancel this Agreement if Buyer is unable to obtain the designated loans."

[11] Item 2I of the original offer provided: "[An unchecked box, then] All cash offer. (If checked) No loan is need to purchase the Property. . . ."

deadline of June 28.[12] There is, in fact, no other reasonable interpretation of the addendum, and certainly none proffered by the Mixes.[13]

Any doubt about this conclusion is quickly dispelled when we look at this hypothetical: Suppose, right after the Mixes signed the addendum, that it was the *Behniwals* and not the Mixes who sought to get out of the deal? Could the Behniwals argue that the absence of the re-signatures contemplated in item 7 of the counteroffer meant that the Mixes had not accepted the Behniwals' offer set forth in the document denominated counteroffer? Of course not. The Mixes' new signature on the addendum effectively took the place of the re-signatures in item 7. Indeed, in context, the addendum would be nonsensical, if not meaningless if, after signing it, the item 7 re-signatures were still required.

But note. At this point we cannot say that the *agreement*, which at this point did exist, satisfied the *statute of frauds*,[14] because the Mixes themselves had not signed a writing which itself set forth enough terms for there to be an

---

[12] California Realtor Association standard forms probably hasten real estate deals when everything goes right, i.e., when neither party wants to back out of a deal. When things go wrong, though, the nature of the forms can have the effect, as they clearly had in this case, of turning things into (in the trial court's word) a "morass." Instead of a clean exchange of forms the way attorneys would structure most deals (if they have the time), the forms and the labels tend to confuse the substance of what is going on. The advantage, of course, is that the need to do original thinking to explain precisely what is going on is minimized, which facilitates transactions en masse.

[13] Our analysis may be in part similar to a line of analysis made in the combined respondents' and cross-appellants' opening brief filed by Seidenberg and Prudential. In their cross-respondents' brief (which, on May 6, 2005, was ordered filed by this court) the Mixes elected to treat this line of analysis (notice, we do not say "issue") as a "new theory on appeal," and therefore as waived. Wrong choice. Most fundamentally, there was no reason Seidenberg and Prudential could not proffer a line of analysis to support the Behniwals' contention that a contract had indeed been formed—they were certainly aggrieved by the judgment, which was predicated on the idea that a contract had not been formed—and the Mixes had a chance to respond to it. Often respondents in appellate proceedings generally try to argue waiver (it's usually easier than meeting a theory or argument on the merits) and if that's all they argue, they pass up the chance to show why the theory or argument may be wrong in the event the court does not agree with the waiver theory. Here, for example, it cannot be reasonably argued that an analysis of item 7 was a "new" theory on appeal when, after all, item 7 was the chief reason the trial court denied relief to the Behniwals despite a series of findings that, to be charitable, did not exactly show the Mixes in a favorable light. To suggest that a line of analysis concerning item 7 is itself a separate "issue" or "theory" on appeal is to parse the idea of "theory" or "issue" to subatomic levels, that is to say, to a point below which appellate and reviewing courts can effectively operate. Finally, even if we were to accept the Mixes' assertion that a line of analysis involving item 7 *was* a new issue, it is clearly one susceptible to appellate analysis *now* because it is the archetypical "issue of law"—construction of language in a contract (and there is absolutely no dispute nor could there be that the Bastanis did not return the counteroffer by the 5:00 p.m. deadline, or ever).

[14] The applicable statute of frauds for this case is set forth in Civil Code section 1624. Subdivision (a) sets forth the various kinds of contracts that "are invalid, unless they, or some

enforceable contract. (See *In re Marriage of Shaban* (2001) 88 Cal.App.4th 398, 405 [105 Cal.Rptr.2d 863] [following Rest., Contracts, § 207 in requiring that writing must state " 'with reasonable certainty . . . the terms and conditions of all the promises constituting the contract' "].) Nor would they sign a document at such a level of specificity later in the process. Thus cases involving the signing-of-escrow-papers[15] are of no help in concluding that the statute of frauds was satisfied, because escrow papers typically restate the essential terms of the contract. As noted, the Mixes signatures had been forged at each of the three major contract documents.

## B.   The Mixes Ratified the Deal Made by Their Agent

■   However, there is a difference between, on the one hand, (1) a writing sufficient to satisfy the statute of frauds and (2) conduct, including signing a document, which is sufficient to ratify an *agent's authority* to have entered into a written contract which, apart from the question of the agent's authority, would otherwise satisfy the statute of frauds.

As our high court recently noted in *Estate of Stephens* (2002) 28 Cal.4th 665, 673 [122 Cal.Rptr.2d 358, 49 P.3d 1093]: " 'Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him.' " Ratification of an "invalid execution," however, must itself be in writing where the agent enters into a contract that must be in writing.[16] (*Ibid.*; see Civ. Code, § 2309 ["An oral authorization is sufficient for any purpose, except that an authority to enter into a contract required by law to be in writing can only be given by an instrument in writing."]; *id.*, § 2310 ["A ratification can be made only in the manner that would have been necessary to confer an original authority for the act ratified, or where an oral authorization would suffice, by accepting or retaining the benefit of the act, with notice thereof."].)

Documents of high levels of specificity, such as escrow instructions, have been held to easily ratify an agent's acts in entering into a deal. (See *Cano v. Tyrrell, supra,* 256 Cal.App.2d 824; *Menveg v. Fishbaugh, supra,* 123 Cal.App. 460.) But what about disclosure statements, which, unlike escrow instructions, typically do not restate a contract's essential terms?

note or memorandum thereof, are in writing and subscribed by the party to be charged or the party's agent." One of those kinds of contracts is "An agreement . . . for the sale of real property, or of an interest therein." (*Id.*, § 1624, subd. (a)(3).)

[15] E.g., *Cano v. Tyrrell* (1967) 256 Cal.App.2d 824 [64 Cal.Rptr. 522]; *Menveg v. Fishbaugh* (1932) 123 Cal.App. 460 [11 P.2d 438].

[16] The awkward phrasing is because we're tracking the language of the statute.

We know, of course, that five days after Seidenberg signed the Mixes' names to the addendum, both Mr. and Mrs. Mix signed a variety of disclosure forms. The question before us is—were their signatures on these disclosure forms sufficient to ratify what Seidenberg had done on their behalf?

■ The nature of ratification was explained in *Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73 [104 Cal.Rptr. 57, 500 P.2d 1401]: "A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it.' " That is, ratification does *not* entail a requirement that the writing sufficiently set forth the terms of the agreement. The idea is that the terms are *already* identifiable; we only need to ascertain whether the principal accepted them. We must therefore conclude that the answer to our question is yes.

One of the disclosure documents expressly refers to "the Residential Purchase Agreement and Receipt for Deposit." Readers should note that even the capitalization of "Purchase Agreement" emphasizes the particularity of *the* agreement. Another disclosure document expressly refers to "this real estate transfer." And a third disclosure document expressly refers to "the close of escrow."

There is thus no doubt that *the* agreement, *this* transfer, and *the* close of escrow—phrases all found in the disclosure documents—all refer to the particular sale to the Behniwals, then the subject of a pending escrow. And even the remainder of the disclosure documents impliedly were made with reference to *this* sale to the Behniwals and the ensuing escrow.

The Mixes indicate, here and there in their briefs, that the disclosure documents should be viewed as stand-alone documents executed, as it were, in a vacuum: The suggestion is that if a couple are going to sell their home sometime in the future anyway, they are going to have to make certain disclosures, so the timing of their execution of *these* disclosure forms is independent of the Behniwal sale.

That just doesn't pass the straight-face test. The logical and natural conclusion to be derived from the signing of disclosure forms is that a *particular sale is pending* absent factual findings to the contrary, and here we have no such factual findings. The trial judge found both that Mrs. Mix had authorized the signing of the papers by Seidenberg and both Mixes recognized that there was an agreement to sell their property.

As noted, at least two of the disclosure documents specifically referenced a *pending* transaction and one a pending escrow. Human nature being what it

is, there is no reason to go to the irritating trouble of filling out disclosure forms unless there is a sale in progress. And of course, the testimony at trial confirmed this view: The Mixes *thought* they had a deal with the Behniwals prior to Mr. Mix's hospitalization, and their signatures on the disclosure documents ratified that deal.

We need only add that at least two appellate decisions have found ratification on less. (We will grant that *Cano* and *Menveg* found it on more.) In *Reusche v. California Pac. Title Ins. Co.* (1965) 231 Cal.App.2d 731 [42 Cal.Rptr. 262], there was, like here, a forgery by an owner's agent (there, of a promissory note and deed of trust), and in fact the owner was unaware of the forgery even at the time the documents were recorded. What's more, the agent even put the proceeds of the loan in his own account and then lied about where the money came from! (*Id.* at pp. 734–735.) Even so, the owner could be held liable on the forged note and deed of trust because she ratified the transaction. Specifically, she was sent a check from her agent in fact drawn on the proceeds of the loan, and when she learned that the money was part of the funds obtained on the forged note she made no offer to return it, but kept it with knowledge of its "source and character." (See *id.* at pp. 735, 737.) Her failure at that point to make reasonable inquiries ensured completion of the transaction, and in accepting the benefits she had effectively ratified the forgeries on her behalf. (See *id.* at p. 738.)

In *Kelley v. R. F. Jones Co.* (1969) 272 Cal.App.2d 113 [77 Cal.Rptr. 170], the essential issue was whether a lessee who vacated a building four months early was on the hook for the rent for that period. The lessor's agent had told the lessee about a proposed sale (which, of course, got delayed) and said that as an "accommodation" the lessee could vacate early. (*Id.* at p. 120.) While the trial court found that the agent did not have actual or ostensible authority to make the statement, the appellate court held that the authority could be implied from a mere reference in a second escrow (involving the pending sale) which specifically deleted a reference to "five" existing leases and substituted a reference to "four" such leases. The change was initialed by the lessor. (*Id.* at p. 121.) Because there was no dispute that there were four *other* leases than the one before the court, the effect of the initialing was the lessor's acknowledgment that the lessee's lease had been terminated. (*Ibid.*)

If merely keeping a check, or initialing an implied recognition that one lease had been terminated, were sufficient ratifications of an agent's previous acts in, respectively, *Reusche* and *Kelley*, then surely the signing of disclosure forms is sufficient here. One should bear in mind that disclosure forms are not, as implied by the Mixes today, meaningless exercises—they surely give rise to enough litigation. You don't just slip into them. And

cashing a check or initialing a small change in escrow instructions does not require nearly the sort of mind-wracking deliberation that a disclosure form does (or should).

Also remember that the basic contract documents had been signed (by Seidenberg) on June 28, but the disclosure statements were signed (by each of the Mixes) on July 3. Clearly the Mixes knew about the deal by July 3, even if we stretch credulity to assume that they didn't specifically know about their forged signatures. (And, to repeat, the trial court found that Mrs. Mix *had* authorized the signatures.) If the Mixes wanted out of the deal *because* Seidenberg had accepted it behind their backs, they should have screamed bloody murder in early July, rather than signing disclosure documents which gave every objective indication that they wanted to go through with "the" agreement, "this" transfer, and "the" escrow.

In sum, there was a deal that satisfied the statute of frauds, and that deal was ratified in writing. The trial court should have granted the Behniwals' request for specific performance.[17]

### III.  SEIDENBERG AND PRUDENTIAL'S APPEAL

#### A.  The Mix Pass-through Component

Certain conclusions necessarily follow in the train of our decision on specific performance. The easiest concerns the order that says that the Behniwals shall recover $63,521.25 from Seidenberg and Prudential because the Mixes, as prevailing parties, can recover $63,521.25 from the Behniwals

---

[17] For some reason neither the Behniwals nor Seidenberg and Prudential have argued estoppel in, respectively, their opening brief and cross-appellants' brief. Since we conclude that the Mixes ratified an otherwise enforceable contract, we need not address the issue except to note that courts have found estoppel in cases where one spouse does not sign the agreement but merely orally consents to a sale. (See *Wilk v. Vencill* (1947) 30 Cal.2d 104 [180 P.2d 351].) And, of course, the cases are legion applying the doctrine of estoppel to a statute of frauds issue *qua* statute of frauds. (E.g., *Juran v. Epstein* (1994) 23 Cal.App.4th 882, 894 [28 Cal.Rptr.2d 588] [" ' " '[T]he statute of frauds, having been enacted for the purpose of preventing fraud, shall not be made the instrument of shielding, protecting or aiding the party who relies upon it in the perpetration of a fraud . . . .' " ' "].) As the court said in *Wilk*, "[w]ithout the qualifying doctrine of estoppel in a proper case the statute would encourage rather than prevent the perpetration of frauds." (*Wilk v. Vencill, supra,* 30 Cal.2d at 108.) It is hard to imagine a case where the estoppel doctrine would be more applicable than this one. Both Mr. and Mrs. Mix had listed their property for sale and both let the escrow proceed. There is no question that Mr. Mix was aware of the terms of the contract and the sale, and could easily and quickly have made any bona fide objection to his wife's acceptance of the buyers' offer known. Mr. Mix testified that he not only gave his wife authorization to act on his behalf during negotiations but with respect to the paperwork as well. Even so, *we need not rely on estoppel for today's decision.*

as the losing parties. The tables are now turned, and there is now no basis for the $63,521.25 order in favor of the Mixes and, by extension, the Behniwals.

## B. The "Tort of Another" Component

The balance of the Behniwal fees ($106,050) was awarded against Seidenberg and Prudential on the theory of "tort of another." The doctrine allows a plaintiff to recover attorney fees " 'if he is required to employ counsel to prosecute or defend an action against a third party because of the tort of the defendant.' " (*Golden West Baseball Co. v. Talley* (1991) 232 Cal.App.3d 1294, 1302 [284 Cal.Rptr. 53], italics omitted, quoting *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 505 [198 Cal.Rptr. 551, 674 P.2d 253].)

The problem we now have is, "where's the tort?" It is one thing for the jury, in the wake of the trial court's denial of specific performance, to award fees against a "forger." But it is quite another when it transpires that the "forger" was really nothing more than an agent, implementing a deal to which the principals consented (cf. *Reusche v. California Pac. Title Inc. Co.*, *supra*, 231 Cal.App.2d 731).

Obviously, this component of the award cannot stand either. Seidenberg and Prudential committed no tort that caused the Behniwals any damages. Because of our conclusion on this point we need not address Seidenberg and Prudential's arguments that the amount is overstated because it involves work that covered both the specific performance action and the cross-complaint for attorney fees (cf. *Cassim v. Allstate Insurance Company* (2004) 33 Cal.4th 780 [16 Cal.Rptr.3d 374, 94 P.3d 513] [apportionment of attorney fees required when fees involved overlapping issues, at least in insurance bad faith case]) or that the award should be reduced by the "negligence" which the jury found on both the Behniwals' part (5 percent) and the Mixes' part (25 percent).[18]

Of course, our reversal of the fee order does not mean that the Behniwals lose on the ultimate issue. This is now a case where the Behniwals have a straight-on claim for their attorney fees as the prevailing parties in the contract action. That claim surely entails *at least* the amount of the "tort of

---

[18] For their part, the Behniwals have argued that the trial court erred in instructing the jury concerning out-of-pocket damages as distinct from benefit-of-the-bargain damages. While, technically, the Behniwals would have had to file a cross-appeal to pursue the issue (i.e., appeal from the judgment to the extent that it denies them such damages), that too is another issue obviated by the reversal of the judgment concerning specific performance. The Behniwals are now actually going to get the "benefit of their bargain," and Seidenberg and Prudential are not liable for any tort.

another" fee award that the trial court awarded the Behniwals from Seidenberg and Prudential. Whether it entails more than that is a matter on which we need not speculate now and can be dealt with by the trial court on remand.

## IV. THE DEFENSE THAT THE BEHNIWALS CANNOT SPECIFICALLY PERFORM

■ The Mixes contend that even if a contract is found to have existed, the Behniwals still were not entitled to specific performance because they could not perform the contract. The rule that the Mixes rely on is that for a buyer of real estate to obtain specific performance, the buyer must prove "that he was ready, willing and able to perform at the time the contract was entered into but that he continued ready, willing and able to perform at the time suit was filed and during the prosecution of the specific performance action." (*C. Robert Nattress & Associates v. CIDCO* (1986) 184 Cal.App.3d 55, 64 [229 Cal.Rptr. 33].)

The Behniwals testified that they had the required $60,000 for the down-payment and a loan, but by the time depositions were being taken they had spent some of the $60,000 on attorney fees (and have not had that much in their account since) and the preapproval had expired. The Behniwals had secured a loan from Mr. Behniwal's brother for the deposit; however, they had neglected to obtain a loan or even ask for an extension on their preapproval. "In cases where the buyer expects to produce the funds for the purchase of a property from a third person through a loan, courts have required the buyer to prove that the prospective lender had the ability to supply the funds and was legally bound to do so by a contract." (*C. Robert Nattress & Associates v. CIDCO, supra*, 184 Cal.App.3d at p. 65.) Therefore, the Mixes argue that since the Behniwals only had preapproval for a loan, they were not at all times "ready, willing and able" to perform the contract and therefore specific performance could not be granted.

The flaw in the argument is the casual assumption that ability to complete the transaction could *only* be shown by the presence of a current lender, legally bound to give the buyers a loan for so much of the contract price as the buyers otherwise cannot pay in cash. The assumption, however, is contrary to *Henry v. Sharma* (1984) 154 Cal.App.3d 665 [201 Cal.Rptr. 478].

■ In *Henry*, buyers had entered into a contract to purchase real property and after breach of contract by the seller, sued for specific performance. The buyers did have a loan approval which the seller attempted to argue was not enough. The court, however, saw things differently and held that "proof needed to show ability [to perform] depends [not on the existence of a legally

enforceable loan agreement, but] on all the surrounding circumstances." (*Henry v. Sharma, supra,* 154 Cal.App.3d at p. 672.) The court held that there was sufficient evidence of the buyers' ability to perform because they had the financial ability to *qualify* for a loan and indeed had qualified for a loan. Thus the court firmly rejected the idea that a legally binding loan agreement is an absolute prerequisite for specific performance: "[W]e find no support for the iron-clad rule suggested by seller that plaintiffs could only establish ability to perform by proving they had obtained a legally enforceable loan contract." (*Ibid.*)

The *Henry* court then addressed the structural problem of mandating that buyers must show a legally binding contract with a lender while the buyers are still in litigation. As the *Henry* court pointed out, there is "no purpose in requiring the buyers to bind themselves to a loan for which they have no immediate need. Moreover, we question whether a lender would make a firm commitment to loan money for the purchase of property the present owner refuses to sell." (*Henry v. Sharma, supra,* 154 Cal.App.3d at p. 672.) The same point was made later in *WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1716 [50 Cal.Rptr.2d 323]: "A buyer is not necessarily unable to obtain a loan merely because he does not have a legally enforceable loan contract."

In the present case, there was easily enough evidence to show that the Behniwals were ready, willing, and able to perform, independent of the financial fallout of the litigation. Primarily, as was the case in *Henry*, they obtained a preapproval on a loan. Secondly, the Behniwals had arranged with Mr. Behniwal's brother to help with the deposit since they had spent their original savings for the deposit on attorney fees.

Finally, the ability-to-perform problem is ultimately self-correcting. If the trial court orders specific performance, it is hardly going to hold the *Mixes*, as sellers, in contempt for not selling to the Behniwals if the Behniwals ultimately can't come up with the money. And if the Behniwals *really* can't come up with the money—which is unlikely and getting unlikelier as time passes—then the Mixes will get their wish and the property simply will not be sold to the Behniwals.[19] We need only add that in an "up market," the "cushion" of equity which lenders typically look for when they lend on a property grows daily: In essence, the difference between the property's 2002 price of $540,000 and its current value represents a kind of extra downpayment made by the Behniwals, thus making lenders that much easier to find.

---

[19] We need not comment on any litigation under such circumstances regarding yet another reallocation of attorney fees.

## V. CONCLUSIONS AND DISPOSITION

If we may be permitted to speculate on at least this one point, though, this reversal will probably not be one in which the trial judge will find any measure of reproof, and we certainly do not intend to convey any. We have already noted several of the comments which indicate the trial judge might have preferred to grant the Behniwals' request for specific performance, but felt hamstrung by the need for a writing to ratify Seidenberg's signing of the contracts. The trial judge would probably have decided in favor of the Behniwals if she had the luxury of the extra time for research and reflection that appellate courts do.

Moreover, the trial judge (wisely in our opinion) devoted some effort to trying to settle the case, both through her good offices and that of a mediator. The judge recognized both the complexity of the case and the downsides to each of the parties. We will not speculate to as to why the settlement talks ultimately failed, but we share the trial judge's regret that they did.

Which is all by way of preliminary remarks on the consequences of today's reversal of all aspects of the judgment appealed from by the parties. Assuming that the Supreme Court permits today's decision to stand, there will be some pain visited on the Mixes. The Behniwals will now be entitled to the fees that were going to be paid by the Mixes' agent (and maybe even their fees on the cross-complaint, though we need not address that issue now) directly from the Mixes themselves since the Behniwals are the new winners of the case. What's more, Seidenberg and Prudential will now seek their commission. Perhaps it would not be too much to hope that the parties might still arrive at some compromise of the remaining issues; we would prefer that, but we cannot alter a result which, we have concluded, is required by the law of ratification, to say nothing of the foundational equities of the case.

The judgment is reversed to the extent that it denies the Behniwals' request for specific performance with directions to enter a new judgment granting that request. The judgment is also reversed to the extent that it awards the Behniwals $169,571.25 against Seidenberg and Prudential in attorney fees.

The interests of justice will not allow for any other disposition of costs other than that both the Behniwals and Seidenberg and Prudential shall recover their costs on appeal from the Mixes.

Finally, the focus of the trial court on remand will be the attorney fee claims of the Behniwals against the Mixes. This focus will necessarily be based on proceedings which transpired prior to this reversal, conducted by Judge Mary Fingal Erickson. Accordingly, we direct that unless Judge

Erickson is retired, somehow disqualified pursuant to section 170.6, subdivision (a)(2) of the Code of Civil Procedure, or not available within the meaning of section 661 of the Code of Civil Procedure, all future proceedings regarding this remand shall be heard before her, regardless of the trial court panel to which she is assigned at the time. She is the one who presided over the trial over both specific performance action as well as the cross-complaints for attorney fees that went to the jury. She has experienced this case in a way no other judge has, and is the only one with firsthand knowledge bearing on the anticipated fee claim.

Rylaarsdam, J., and Ikola, J., concurred.