Filed 5/26/26  HBA Enterprises v. Thach CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| HBA ENTERPRISES, INC.,<br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>MUC THACH,<br>　　　Defendant and Appellant. | C101749<br><br>(Super. Ct. No. 34-2018-00243132-CU-OR-GDS)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed in this case on May 5, 2026, be modified as follows:

On page 14, the first sentence of the last paragraph on that page, the words "Thach provides no legal authority to support this contention and we note that," are deleted and replaced with "Whatever the merits of Thach's argument about what Code of Civil Procedure section 631.8 does or does not allow," so the sentence now reads:

> Whatever the merits of Thach's argument about what Code of Civil Procedure section 631.8 does or does not allow, "[t]rial courts have broad discretion in deciding whether to reopen the evidence."  (*Horning v. Shilberg* (2005) 130 Cal.App.4th 197, 208.)

1

There is no change in the judgment.

Appellant's petition for rehearing is denied.

BY THE COURT:


/s/
EARL, P. J.


/s/
HULL, J.


/s/
MESIWALA, J.

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| HBA ENTERPRISES, INC.,<br> Plaintiff and Respondent,<br><br>v.<br><br>MUC THACH,<br> Defendant and Appellant. | C101749<br><br>(Super. Ct. No. 34-2018-00243132-CU-OR-GDS) |

This case involves a real estate sale that was canceled at the last minute by the seller, defendant Muc Thach.  When Thach refused to close escrow, the buyer, plaintiff HBA Enterprises, Inc. (HBA), filed a lawsuit seeking specific performance of the purchase agreement.  Following a bench trial, the court awarded HBA both specific performance and over $250,000 in compensation incidental to specific performance.  Thach appeals both the award of specific performance and two components of the incidental compensation award.  Finding no error, we affirm the judgment in full.

### BACKGROUND

*I.*
*The Evidence at Trial*

Navjit Bhullar's family has owned and operated Capital Grocery in Sacramento since at least 2004.  The store occupied the first floor of the real property at issue in this lawsuit, and Bhullar's family occupied a residence on the second floor.  Thach owned the

1

property, and Bhullar's family leased it from him. At the time of the events giving rise to this lawsuit, Bhullar's mother, Harjinder Kaur, was the lessee, and Bhullar testified it was his mother who owned the store as well. Bhullar helped his mother handle the day-to-day operations of the store, and in around 2015, they began talking about trying to buy the property. In early 2018, Thach agreed to sell it to them for $850,000. The buyer would be HBA, a corporation owned by Bhullar. Bhullar testified the plan was for HBA to purchase the property and then transfer it to his mother.

In February 2018 (subsequent dates are in 2018), Thach and HBA signed a purchase agreement. It specified the price was $850,000 and would be financed, in part, with a $765,000 loan. It also provided the seller would pay all escrow fees and city and county transfer taxes and fees. Finally, it provided escrow was to close 75 days after acceptance.

The same day he signed the purchase agreement, Thach sent an e-mail to HBA's real estate agent, Joudi Chehade, stating, "I just signed the contract but I want to make sure you know that buyer [is] to pay all escrow fee[s], title fees and any fees … . Again buyer will need to pay all escrow, … title fees, transfer fee, tax fee, etc." Thach stated he did not know how to change the purchase agreement, and he asked Chehade to change it for him. The next week, Chehade sent the purchase agreement to the escrow officer along with a note stating, "there will be one more addendum to adjust escrow and closing costs to be paid by Buyer."

It took HBA longer than anticipated to obtain a loan and escrow thus did not close within 75 days of acceptance. Bhullar testified he and his mother "contacted numerous banks" but they were unable to get a conventional loan because the property appraised for less than the purchase price. Bhullar was ultimately able to secure a loan from a hard money lender, and on August 8, Thach and HBA signed an addendum to the purchase agreement that extended the close of escrow to September 30.

2

In early September, Thach and HBA signed another addendum (addendum no. 1) that incorporated the following provision into the purchase agreement: "[E]scrow and recurring and nonrecurring closing costs to be paid by Buyer [¶] seller to net [$]850,000." Thach ultimately refused to close escrow because of a dispute over what closing costs HBA agreed to pay and what was meant by seller to net $850,000.

Chehade drafted the addendum, and she testified it contained "standard verbiage that is used when closing costs are discussed." She testified, "standard closing costs" included escrow fees, title fees, transfer taxes, and property taxes, and HBA agreed to pay all of those costs. The intent was not that HBA would pay the income taxes that Thach owed due to the sale because "[t]hat's not related to the real estate transaction itself." Bhullar testified HBA agreed to pay transfer taxes associated with the sale of the property, but not Thach's incomes taxes.

Thach testified, "850 is exactly what I want, not a penny more or less," but he provided inconsistent testimony on whether he expected HBA to pay his income taxes. He initially testified, "Netting 850 meaning that the buyer must pay for all the fees … and the tax[es]. Anything that occurred during the transaction … the buyer must pay, including all taxes, income taxes as well." He then changed course and testified he did *not* expect HBA to pay his income tax:

Q: "[S]o … you expected the buyer to pay … any income taxes due?

"A: When I say 'tax,' my understanding [is] all taxes, including sales taxes.

"Q: You mentioned the word 'income taxes'? [¶] … [¶]

"A: If I said income tax, I meant … sales tax. [¶] … [¶]

"Q: So you did not expect the buyer to pay your income tax?

"A: *I do not.*" (Italics added.)

Pina McDermot was the escrow officer. Shortly before escrow was scheduled to close, she e-mailed Thach a form to complete regarding withholding money for the Franchise Tax Board (FTB). She advised him to contact his tax advisor to help determine

3

whether "there's a loss or zero gain" due to the sale of the property, and thus whether an FTB withholding was necessary, and, if so, in what amount. She testified if a seller does not complete the form, the escrow company is required to withhold 3 1/3 percent of the purchase price and remit it to the FTB.[1] She explained the withholding covered "the seller's taxes" due on gain from the sale, and when the seller filed a tax return, they would be entitled to a refund if it turned out they did not owe the amount withheld.

Thach did not complete the form, and McDermot thus prepared a seller's closing statement showing 3 1/3 percent of the $850,000 purchase price, or $28,331, would be withheld from the sale proceeds and remitted to the FTB, and the amount due to Thach at closing would be approximately $821,000. Thach contacted McDermot and said the closing statement "was not right" because he was supposed to net $850,000. He also sent McDermot an e-mail stating, "Buyer is supposed to pay the 3 1/3 withholding to franchise tax boards. We [are] supposed to net $850K and buyer [is] supposed to pay for everything that's related to this transaction." McDermot responded, "FTB is not considered a closing cost charge as it's a 'withholding of seller taxes' " and represented a "prepay[] for income taxes." Thach replied, "Even if FTB is not closing cost charges, it's a charge that's related to [sale] of property, and if I don't get $850K (not a penny less) then we … [will] see them in court."

On September 24, HBA sent Thach a written demand to close escrow by September 28. That same day, McDermot e-mailed Thach to ask if he was ready to sign

---

[1]   McDermot identified the form as "Franchise Tax Board 593." As a general rule, when California real property is sold, state law requires the buyer or the escrow agent to withhold 3 1/3 percent of the sales price and remit it to the FTB unless the seller completes and signs FTB Form 593 certifying that no withholding is required or that a different amount should be withheld. (See Rev. & Tax Code, § 18662, subd. (e); 18 Cal. Code Regs. § 18662-3, subds. (a)-(d), (f), (h).)

the closing documents, and he responded, "I already told you many time[s] that I will only sell property netting $850K, buyer must pay for everything else."

On September 26, McDermot e-mailed Thach and informed him HBA's lender was ready to fund the loan, and he responded, "I will see the buyer[] … in court because I already told them that in order for me to sell my property, I need exactly $850K wire[d] into my account (not a penny less)." McDermot responded, "I am trying to help you. I have been in escrow over 30 years and I have never seen a buyer pay a FTB withholding for the seller[']s income taxes." Thach responded, "My case is a special case where the buyer approach[ed] me and wants to buy the property and I told them that I must net $850k wire[d] into my bank." Thach thus refused to close escrow. Shortly thereafter, HBA filed the present lawsuit seeking specific performance.

*II.*
*The Interim Order Granting Specific Performance*

At the conclusion of trial, the court stated it found the parties entered into a contract for the sale of the property and agreed on a purchase price of $850,000. It further found the addendum that provided, "seller to net [$]850,000" did not modify the purchase price and must be interpreted in light of the preceding phrase — i.e., "escrow and … closing costs to be paid by Buyer." Read as a whole, the addendum meant the seller was to net $850,000 after the buyer paid escrow and closing costs. It also found HBA was ready, willing, and able to perform its side of the agreement back in 2018, and it had the present ability to perform as well. It stated it would enter judgment in favor of HBA and order specific performance and an accounting, and it directed HBA's counsel to prepare an order to that effect.

On October 19, 2023, the trial court signed and entered interim findings and order (the interim order). In the interim order, the court found the parties must abide by the purchase agreement "signed in February 2018 and as amended by Addendum No. 1 signed in September 2018." As relevant here, it interpreted addendum no. 1 — i.e.,

5

"escrow and recurring and nonrecurring closing costs to be paid by Buyer  [¶]  seller to net [$]850,000" — as requiring HBA to pay all costs, fees, and taxes associated with closing and escrow, but *not* the income taxes Thach owed as a result of sale of the property and *not* Thach's withholding to the FTB.  The court then ordered the following: (1) HBA "is granted the remedy of Specific Performance"; (2) HBA "shall hereafter present an accounting of damages which is subject to objections by … Thach with a hearing thereon to be scheduled at a later date if required"; and (3) "This is not a final judgment.  A final judgment will be rendered after the hearing on … HBA Enterprises, Inc.'s accounting of damages."

*III.*
*The Parties' Compliance with the Interim Order*

Although a final judgment had not yet been entered, the parties immediately began taking steps to comply with the interim order of specific performance.  That order did not specify a date by which escrow had to close, and a dispute arose as to that date.  Thach took the position that the original purchase agreement provided escrow had to close 75 days after acceptance, acceptance should be equated with the date the interim order was issued (i.e., October 19, 2023), and escrow thus had to close by January 2, 2024.  When escrow did not close by that date, Thach notified HBA and the escrow officer he was canceling the purchase agreement.  Two days later, HBA filed an ex parte application for an order directing the close of escrow on or before January 20, with "[l]eeway of 15 days in case of any unforeseen delays with escrow."  Thach opposed the application, arguing there was no emergency justifying ex parte relief and he was justified in canceling the purchase agreement because HBA failed to timely perform.

The court held a hearing on January 8.  According to the minute order, "After hearing from counsel the Court set a further hearing [on January 19] to allow the Plaintiff time to attempt to find a new escrow company or find an underwriter that is willing to insure the current escrow."  According to the minute order from the further hearing on

6

January 19, "Counsel for the Plaintiff and the representative for HBA Enterprises Inc gave the court information regarding the title insurance they were attempting to obtain. [¶] The Plaintiff indicated they had … potentially obtained title insurance with Allied Title Company. The loan company indicated they needed to have the release of lis pendens. Plaintiff indicated that they had the notarized release of lis pendens." That same day, the court issued a written order modifying the interim order to provide "escrow shall close no later than February 15, 2024."

It appears escrow closed by February 15, and the order of specific performance has been fully performed.

*IV.*
*The Statement of Decision Regarding Incidental Compensation*

Several months later, the court held an evidentiary hearing on HBA's request for an accounting (or what we will refer to as its request for incidental compensation). Following the hearing, the court issued a statement of decision finding HBA was entitled to an award of $252,619.47 in order "to relate the performance back to the contract date … and to adjust the equities between the parties because of the delayed performance by the seller." In particular, it found HBA was entitled to $210,000 in lost rental income, $21,400 in increased compensation paid to its real estate agent, and $21,219.47 in increased closing costs and appraisal fees. We will discuss the basis for this award in more detail below.

*V.*
*The Judgment*

On June 13, 2024, the court entered judgment (1) declaring HBA the prevailing party, (2) incorporating the interim order granting specific performance, and (3) ordering Thach to pay HBA $252,619.47. Thach filed a timely notice of appeal from the judgment.

DISCUSSION

Thach challenges the judgment on multiple grounds and requests "in the alternative" that we order: "[T]he Judgment is void to the extent of an award of $210,000 for hypothetical lost rental income to nonparty Kaur; the Judgment is reversed to the extent of an award of $21,400 for real estate commission paid by HBA to its broker; the Judgment is reversed to the extent of granting the remedy of specific performance; and the Judgment is reversed in whole."

*I.*
*Standards of Review*

"In reviewing a judgment … following a bench trial, we review questions of law de novo. [Citation.] We apply a substantial evidence standard of review to the trial court's findings of fact. [Citation.] Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) The grant of specific performance and other equitable remedies is reviewed for an abuse of discretion, although any underlying factual findings are reviewed for substantial evidence. (See *Greif v. Sanin* (2022) 74 Cal.App.5th 412, 443; *Parage v. Couedel* (1997) 60 Cal.App.4th 1037, 1041.) Certain other types of rulings, which will be noted below, are also reviewed for abuse of discretion. " 'Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.) " 'A court also abuses its discretion if it applies improper criteria or makes incorrect legal assumptions.' " (*Noble v. Superior Court* (2021) 71 Cal.App.5th 567, 578.)

## II.
### Challenges to the Order of Specific Performance

A. HBA's Ability to Perform

"[T]o obtain specific performance, a buyer must prove not only that he was ready, willing and able to perform at the time the contract was entered into but that he continued ready, willing and able to perform at the time suit was filed and during the prosecution of the specific performance action." (*C. Robert Nattress & Associates v. CIDCO* (1986) 184 Cal.App.3d 55, 64.) "[T]he proof needed to show ability depends on all the surrounding circumstances." (*Henry v. Sharma* (1984) 154 Cal.App.3d 665, 672 (*Henry*).) The "buyer's ability to perform" "is a question of fact," and we thus review the trial court's findings on this issue for substantial evidence. (*Id.* at p. 670.) Thach argues there was insufficient evidence that HBA had the ability to perform at the time of trial, or what we will refer to as the present ability to perform. We disagree.

Bhullar testified that, as of September 2018, HBA had come up with the deposit and the down payment and had obtained a loan for the remaining amount of the purchase price. He also testified all required funds were on deposit with the escrow company, and the escrow officer confirmed "all the funds were in." The trial court found the evidence was "absolutely clear" that HBA was ready, willing, and able to close in September 2018, and Thach does not challenge this finding. It bears emphasizing that HBA was not just ready, willing, and able to perform at the time required by the contract — it had fully performed.

As for the present ability to perform, Bhuller testified HBA currently had funds available to make the initial $5,000 deposit, the $80,000 down payment, and closing costs, explaining, "[m]y family's been saving up money for this transaction … for years." He also testified he was "confident" HBA would once again be able to obtain a loan for the remaining amount based on his "tax returns" and his "credit score." On cross-examination, he acknowledged he did not have sufficient cash on hand to purchase the

9

property, but he reiterated he had the ability to get a loan based on his good credit and his income.

The trial court found the evidence was "sufficient to establish … a present ability to perform pursuant to the terms of the original contract." It later stated, "that the Plaintiff was ready to close back in September [2018], had done everything necessary and demanded the transaction close back in September of 2018 shows that he is prepared to close now, not as we sit here today, but within the requisite amount of time, which I believe is 75 days under the contract. So he showed a present ability to perform."

Thach argues the evidence is insufficient to support the trial court's finding HBA had the present ability to perform. He notes Bhullar testified he did not currently have $850,000 cash on hand. This is true but not controlling, because the purchase agreement acknowledged HBA would obtain a loan for the bulk of the purchase price.

Thach also notes Bhullar testified he had not actually obtained a loan at the time of trial. This is also true but not controlling, because a buyer seeking specific performance need not show it has obtained a loan in order to prove ability to perform. (See, e.g., *Behniwal v. Mix* (2005) 133 Cal.App.4th 1027, 1044 (*Behniwal*) [holding ability to perform need not "be shown by the presence of a current lender"]; *Henry, supra*, 154 Cal.App.3d at p. 672 [rejecting "rule suggested by seller that [buyers] could only establish ability to perform by proving they had obtained a legally enforceable loan contract"].) Indeed, as the *Behniwal* court noted, a lender is unlikely to make a firm commitment to loan money for the purchase of property while litigation between the buyer and the seller is pending. (*Behniwal*, at p. 1045.)

Thach also notes Bhullar testified he had trouble obtaining a loan in 2018, and he argues this proves he could have trouble obtaining a loan in 2023 as well. We disagree. Bhuller testified it took him longer than expected to obtain a loan in 2018 because the property appraised for less than the purchase price and he was thus unable to get a conventional loan. However, he was ultimately able to secure a loan through a hard

10

money lender.  At best, the evidence suggests HBA might have to borrow money from a hard money lender rather than a conventional lender, but it does not undermine the trial court's finding HBA had the ability to perform.

Finally, Thach argues Bhullar's testimony he would be able to obtain a loan was too conclusory and self-serving to constitute substantial evidence.  The trial court found otherwise, and Thach fails to convince us it erred in doing so.  We reiterate, " 'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court.  *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*' " (*Henry, supra*, 154 Cal.App.3d at p. 670.)

In this regard, we note (as did the trial court) that HBA obtained a loan in 2018, and this is at least some evidence of its ability to do so in 2023 as well.  In *Behniwal, supra*, 133 Cal.App.4th at page 1044, for example, the buyers testified that, at the time required by the contract for performance, they had been preapproved for a loan, but by the time of trial, "the preapproval had expired."  The court held the evidence was sufficient to show the buyers had the present ability to perform.  (*Id*. at p. 1045; see also *Henry, supra*, 154 Cal.App.3d at pp. 670-672 [loan approval sufficient to demonstrate financial ability].)  Here, the buyer's ability to perform is even clearer than it was in *Behniwal*, because HBA had not just been preapproved for a loan — it had actually obtained a loan.

Moreover, as the *Behniwal* court went on to note, "the ability-to-perform problem is ultimately self-correcting.  If the trial court orders specific performance, it is hardly

11

going to hold the [defendants], as sellers, in contempt for not selling to the [plaintiffs] if the [plaintiffs] ultimately can't come up with the money. And if the [plaintiffs] *really* can't come up with the money … then the [defendants] will get their wish and the property simply will not be sold to the [plaintiffs]." (*Behniwal, supra*, 133 Cal.App.4th at p. 1045.) This conclusion finds support in Civil Code section 3386 and the Restatement of Contracts, both of which deal with appropriate ways to secure the plaintiff's performance if specific performance is granted.

Civil Code section 3386 provides specific performance may be granted if "[t]he agreed counterperformance has been substantially performed or its concurrent or future performance is assured or, if the court deems necessary, can be secured to the satisfaction of the court." (Civ. Code, § 3386, subd. (b).) The California Law Revision Commission comments to this section note, "the assurance or security that the defendant will receive the agreed counterperformance may be provided by the plaintiff's past conduct, by his economic interest in performing, or by granting a conditional decree."[2] (Cal. Law Revision Com. com., 12A Pt. 1 West Ann. Civ. Code, (2016 ed.) foll. § 3386, p. 430.) Here, all three types of assurance are present — HBA obtained a loan in 2018, it had an economic interest in performing, and pursuant to the order of specific performance, Thach would not have to perform if HBA could not come up with the purchase price.

The Law Revision Commission's comments to Civil Code section 3386 state it is based on section 373 of the Restatement of Contracts, which provides, "Specific enforcement may properly be refused if a substantial part of the agreed exchange for the performance to be compelled is as yet unperformed and its concurrent or future

---

[2]    "In determining the legislative intent of a statute, it is proper to look to comments by the [Law Revision] Commission, which are persuasive evidence of the intent of the Legislature in enacting the Commission's recommendations." (*Gormley v. Gonzalez* (2022) 84 Cal.App.5th 72, 80.)

12

performance is not well secured to the satisfaction of the court." The comments to section 373 explain, "The purpose of the rule stated in the Section is to make sure that the defendant is not compelled to render his promised performance substantially in full without also receiving substantially in full the performance constituting the agreed exchange." (Rest., Contracts, § 373, com. a, p. 683.) The comments also explain, "frequently security to the defendant can be afforded by the terms of the decree itself." (*Ibid*.) For example, "If performance by the plaintiff … will be due simultaneously with the defendant's performance, … the decree may be made conditional on the rendition of the agreed performance by the plaintiff." (Rest., Contracts, § 373, com. b, pp. 683-684.) In other words, the specific performance decree can specify the seller need only deliver the deed if the buyer comes up with the purchase price.

That is effectively what happened in this case. The trial court ordered the parties to abide by and specially perform the purchase agreement, and " '[i]n a contract for the sale of real estate the delivery of the deed and the payment of the purchase price are dependent and concurrent conditions.' " (*Rutherford Holdings, LLC v. Plaza Del Rey* (2014) 223 Cal.App.4th 221, 228.) Thus, if HBA did not come up with the purchase price, Thach would have no obligation to deliver the deed and the property would not be sold. Here, of course, HBA came up with the purchase price, the property was sold, and the specific performance decree has been fully performed. In short, we find no reversible error in the trial court's finding regarding HBA's ability to perform.

## B. Allowing HBA to Reopen its Case

Thach also argues the trial court abused its discretion when it allowed HBA to reopen its case in order to submit evidence of its present ability to perform. We disagree.

Immediately after HBA rested its case, Thach moved for judgment pursuant to Code of Civil Procedure section 631.8, arguing that HBA failed to present evidence of its present ability to perform. After hearing argument from both parties, the court stated, "I have heard testimony by Mr. Bhullar that he does intend to proceed with the transaction.

13

What I didn't hear is evidence of his present financial ability to perform. [¶] So what I will do is allow Plaintiff to reopen on that one issue." Bhullar then testified as described above. Thach argues it was improper under section 631.8 to permit HBA to reopen its case.

Code of Civil Procedure section 631.8 provides, "After a party has completed his presentation of evidence in a trial by the court, the other party … may move for a judgment. The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party … or may decline to render any judgment until the close of all the evidence." (Code Civ. Proc., § 631.8, subd. (a).) Although section 631.8 provides either party may move for judgment, the motion is ordinarily "made by the defendant at the close of the plaintiff's case." (*People v. Mobil Oil Corp.* (1983) 143 Cal.App.3d 261, 267, fn. 6.) As relevant here, when a defendant moves for judgment, section 631.8 provides, "The court may consider all evidence received, provided, however, that *the [plaintiff] shall have had an opportunity to present additional evidence to rebut evidence … deemed … to have been adverse to him, and to rehabilitate the testimony of a witness whose credibility has been attacked by the [defendant].*" (Italics added.) Highlighting the italicized language, Thach contends section 631.8 only permitted HBA to reopen its case to present additional evidence to rebut adverse evidence or to rehabilitate the credibility of a witness, and did not permit HBA to reopen its case to present additional evidence to make up for a failure of proof in the first instance.

Thach provides no legal authority to support this contention and we note that "[t]rial courts have broad discretion in deciding whether to reopen the evidence." (*Horning v. Shilberg* (2005) 130 Cal.App.4th 197, 208.) A decision to allow a party to reopen evidence " 'is addressed to the discretion of the trial court whose determination is binding on appeal in the absence of palpable abuse.' " (*McLear-Gary v. Scott* (2018)

14

25 Cal.App.5th 145, 151.) Thach fails to convince us the trial court palpably abused its discretion in allowing HBA to briefly reopen its case shortly after it rested.

## C. Contract Formation

In order to obtain specific performance, it is "basic hornbook law" that the plaintiff must prove "the existence of a contract." (*Roth v. Malson* (1998) 67 Cal.App.4th 552, 557.) And "[t]o form a valid contract there must be a meeting of the minds, i.e., mutual assent." (*Moritz v. Universal City Studios LLC* (2020) 54 Cal.App.5th 238, 246.) Thach argues there is not substantial evidence a contract was formed because there was no meeting of the minds as to the purchase price. We disagree.

" 'California recognizes the objective theory of contracts [citation], under which "[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation." ' " (*Iqbal v. Ziadeh* (2017) 10 Cal.App.5th 1, 8.) "Under the objective test of contract formation, a 'meeting of the minds' is unnecessary. A party is bound, even if he misunderstood the terms of a contract and actually had a different, undisclosed intention." (*Blumenfeld v. R. H. Macy & Co.* (1979) 92 Cal.App.3d 38, 46.) " '[I]n the interest of preserving some reasonable stability in commercial transactions, the courts will not set aside contractual obligations, particularly where they are embodied in written contracts, merely because one of the parties claims to have been ignorant of, or to have misunderstood, the provisions of the contract.' " (*Hedging Concepts, Inc. v. First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410, 1421.) " '[W]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible … .' [Citation.] Thus, in a case like this involving a written contract, whether there was mutual consent — i.e., a meeting of the minds — must be determined from the written contract itself, and *if a reasonable and lawful construction can be given to the contract, then that is where we must conclude the minds of the parties met.*" (*Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 817, italics added.)

15

As found by the trial court, there was no real dispute over the purchase price — it was $850,000. The dispute (and, as we discuss below, it is not clear there was a dispute) was over whether HBA was responsible for paying Thach's FTB withholding in order to ensure he netted $850,000 at the close of escrow. Addendum no. 1 incorporated the following provision into the purchase agreement: "[E]scrow and recurring and nonrecurring closing costs to be paid by Buyer [¶] seller to net [$]850,000." As noted above, the trial court interpreted this addendum as requiring HBA to pay all "costs, fees, and taxes associated with closing and escrow," but not Thach's income taxes emanating from the sale of the property, and thus not Thach's withholding to the FTB. We agree with the trial court's interpretation.

As Chehade testified, addendum no. 1 used "standard verbiage" that required the buyer to pay "standard closing costs," including escrow fees, title fees, transfer taxes, and property taxes, and after the buyer paid those standard closing costs, the seller would net $850,000. Thach does not contend the phrase "escrow and … closing costs" can reasonably be interpreted to include the seller's income taxes or FTB withholding, and we agree it cannot be interpreted in that way. (See Civ. Code, § 1645 [when interpreting a contract, "Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense"].) Instead, Thach focuses entirely on the phrase "seller to net [$]850,000." He argues that if the only way he could net $850,000 was if HBA paid his income taxes, then HBA had to pay his income taxes in order to comply with the purchase agreement. Thach's interpretation is unreasonable. We find the trial court gave the purchase agreement "a reasonable and lawful construction" (indeed, it is difficult to see how the trial court could have interpreted it any other way), and that is thus "where we must conclude the minds of the parties met." (*Quantification Settlement Agreement Cases, supra*, 201 Cal.App.4th at p. 817.)

16

There is a second reason to uphold the trial court's construction — namely, that Bhullar and Thach both testified they did not construe the agreement as requiring HBA to pay Thach's income taxes. As noted above, Bhullar testified HBA agreed to pay transfer taxes, but not incomes taxes Thach owed on gains from the sale. And although Thach initially testified he understood that "[n]etting 850" meant HBA must pay "all taxes, income taxes as well," he quickly changed his testimony and clarified he did *not* expect HBA to pay his income tax:

"Q: So you did not expect the buyer to pay your income tax?

"A: I do not."

The trial court was free to find Thach's clarifying testimony more credible than his initial testimony, which provides further support for its interpretation of the purchase agreement. (See *Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359, 1376-1377 ["The testimony of a single witness may constitute substantial evidence," and "where there is conflicting evidence on an issue, we do not review the [trial court's] implicit determination of credibility"].) Simply put, the parties' testimony establishes they mutually agreed HBA would pay all standard closing costs, but would not pay Thach's income taxes, and HBA thus was not responsible for paying the FTB withholding amount in order to ensure Thach received a check for $850,000 at closing.

D. HBA's Ex Parte Application

Thach also argues the trial court abused its discretion in granting HBA's ex parte application for an order directing that escrow close by a date certain and ordering that escrow had to close by February 15, 2024. We disagree.

At the end of trial, the court stated it was going to order specific performance, and it asked the parties, "do we want to discuss the mechanics of that? I believe — is it true that the purchase contract provides for a 75-day time period to get financing?" Nobody responded to the court's question. After conferring with Bhullar, HBA's counsel stated HBA was prepared to start escrow "on Monday," but the court interjected, "Well, that's

17

not the order … . [¶] … [¶] … My … concern is that I don't know how often title companies do specific performance sales." The court also stated the specific performance decree would have to be issued "before [HBA] can even open escrow. So I think we should talk about … getting that done and then … deciding on … time limits." The trial court asked HBA's counsel to prepare a proposed order and directed the parties to "meet and confer" on the order.

HBA's counsel ultimately prepared a proposed interim order that was approved as to form by Thach's counsel, and the trial court signed and entered the interim order on October 19, 2023. The interim order granted HBA specific performance and provided the parties "shall comply with [the] terms" of the purchase agreement, but it contained no dates or time limits by which required actions had to be completed and it did not specify a date by which escrow had to close. It is thus perhaps not surprising that a dispute arose over when escrow had to close.

The original purchase agreement stated the close of escrow "shall" occur within 75 days of "acceptance," and both parties appeared to agree they were bound by that deadline (although, as discussed below, that is not necessarily the case). As noted above, Thach took the position the 75-day time period ran from the date the interim order was issued (October 19, 2023), in which case escrow had to close by January 2, 2024. HBA, in contrast, took the position it ran from the date escrow was opened (November 7, 2023), in which case escrow had to close by January 22, 2024. When escrow did not close by the date Thach believed it had to close, he canceled the agreement, and HBA filed its ex parte application two days later. After holding two hearings on the application (on January 8 and January 19), the court ultimately ordered that escrow had to close by a date certain — February 15, 2024 — and escrow closed by that date.[3]

---

[3] No court reporter was present at either hearing and our only record of what occurred comes from the minute orders, which were quoted above. As discussed in more

18

Ex parte proceedings "are designed to afford relief on an essentially emergency basis." (*Newsom v. Superior Court* (2020) 51 Cal.App.5th 1093, 1097.) "[T]he rules governing ex parte applications … require that '[a]n applicant … make an affirmative factual showing … of irreparable harm, immediate danger, or any other statutory basis for granting relief ex parte.' [Citations.] … [Citations.] We review a trial court's ruling on an ex parte application for abuse of discretion." (*People ex rel. Allstate Ins. Co. v. Suh* (2019) 37 Cal.App.5th 253, 257.) Although not entirely clear, Thach appears to argue the trial court abused its discretion in granting HBA's application on an ex parte basis because there was no emergency. If so, we disagree. The parties had been taking steps to comply with the order of specific performance for over two months. It appears the process moved slowly at first because the escrow company and potential lenders were not used to dealing with property being sold pursuant to an order of specific performance and they had to check with their "legal team[s]" before proceeding. In any event, HBA opened an escrow on November 7, 2023, and was taking steps to close escrow when Thach canceled the contract, thus stopping the process in its tracks. We see no abuse of discretion in treating the cancellation as an emergency and entertaining an ex parte application rather than requiring HBA to file a regularly noticed motion.

Thach's primary argument is that the trial court abused its discretion by ordering that escrow had to close by February 15. He contends this "extend[ed] the close of escrow beyond the 75 days after acceptance" provided in the purchase agreement and gave HBA more time to close escrow than the purchase agreement gave it. He argues the

---

detail below, when no transcript is provided, an appellant is generally precluded from either (1) establishing the trial court abused its discretion or (2) raising an argument as to the sufficiency of the evidence to support the decision. (See *Vo v. Las Virgenes Municipal Water Dist.* (2000) 79 Cal.App.4th 440, 448; *Estate of Fain* (1999) 75 Cal.App.4th 973, 992 (*Fain*).) The lack of a record of what occurred at the hearings on the ex parte application provides an additional basis for upholding the trial court's order.

19

court thus effectively rewrote the parties' contract in contravention of case law that instructs, "The court does not have the power to create for the parties a contract which they did not make, and it cannot insert in the contract language which one of the parties now wishes were there." (*Levi Strauss & Co. v. Aetna Casualty & Surety Co.* (1986) 184 Cal.App.3d 1479, 1486.) We disagree with the premise of Thach's argument.

While a court may not rewrite a contract under the guise of ordering specific performance, the performance required " 'need not be identical with that promised in the contract; it may be so drawn as best to effectuate the purposes for which the contract was made, and it may be granted on such terms and conditions as justice requires.' " (*Rogers v. Davis* (1994) 28 Cal.App.4th 1215, 1222 (*Rogers*).) This is particularly true where " '[t]he exact performance that is promised in a contract' " has effectively " 'become impossible.' " (*Ibid.*) In such a case, a court sitting in equity has broad discretion to order performance " 'that is not identical' " to that required by the contract but that " 'achieve[s] substantially the same result.' " (*Ibid.*; see also *Tamarind Lithography Workshop, Inc. v. Sanders* (1983) 143 Cal.App.3d 571, 575 [performance ordered need only be "substantial[ly] similar[]" "to that promised in the contract"].) Based on the record before us, that is precisely what the trial court did.

The original purchase agreement stated escrow had to close within 75 days of "acceptance," and it defined "acceptance" as the date "this offer … is accepted in writing by a Party and is delivered to and personally received by the other Party or that Party's authorized agent in accordance with the terms of this offer." Acceptance as defined by the agreement thus occurred on February 13, 2018, when Thach signified he accepted HBA's offer by signing the agreement. Given the subsequent course of events, the agreement's definition of "acceptance" was rendered essentially meaningless, because it would be impossible in 2024 to close escrow within 75 days of a date that occurred in 2018. Moreover, adopting Thach's contention that "acceptance" should be equated with the date the interim order was entered would rewrite the parties' agreement, which is

20

precisely what Thach argues courts are *not* empowered to do. The problem here is that all of the purchase agreement's deadlines run from the date of "acceptance," not from some other date related to an order of specific performance. Indeed, Thach comes close to acknowledging the problem when he states, "Post-trial, the acceptance date could potentially mean" any one of three or four dates. Simply put, the purchase agreement was not drafted to cover a sale ordered by a specific performance decree. This is thus precisely the type of case where " '[t]he exact performance that is promised in a contract' " has " 'become impossible,' " and the court thus had discretion to craft a specific performance decree " 'to achieve substantially the same result' " as was provided in the contract. (*Rogers, supra*, 28 Cal.App.4th at p. 1222.) We find no abuse of discretion in the trial court's order that escrow had to close by February 15, 2024.

We also note the dispute over when escrow had to close could have been entirely avoided by better drafting. For example, the interim order could have specified a date certain by which escrow had to close. Alternatively, it could have specified that a particular date would be deemed the date of "acceptance" and all time limits in the purchase agreement calculated accordingly. It did neither. Indeed, as noted above, the interim order contains no mention of dates, deadlines, or time limits. In this regard, we note the interim order was drafted by HBA's counsel and *approved as to form by Thach's counsel*. Thach can hardly be heard to complain about how the court resolved a dispute his own counsel helped create.

### III.
### *Challenges to the Incidental Compensation Award*

Thach also challenges two portions of the incidental compensation award: (1) $210,000 for lost rental income; and (2) $21,400 for increased real estate agent commission.

Before addressing Thach's arguments, we note the court awarded incidental compensation following an evidentiary hearing on that issue, but we do not have a record

21

of what happened at that hearing. As a general rule, "A proper record includes a reporter's transcript or a settled statement of any hearing leading to the order being challenged on appeal." (*Elena S. v. Kroutik* (2016) 247 Cal.App.4th 570, 574; see also Cal. Rules of Court, rule 8.120(b) ["If an appellant intends to raise any issue that requires consideration of the oral proceedings in the superior court, the record on appeal must include a record of these oral proceedings in the form of one of the following: [¶] (1) A reporter's transcript … ; [¶] (2) An agreed statement … ; or (3) A settled statement …"].) Here, no reporter's transcript exists because there was no court reporter present at the hearing, and Thach has not provided us with an agreed or settled statement. "Although in certain instances a reporter's transcript may not be necessary, including if an appeal involves a legal issue requiring de novo review [citation], on issues … involving the abuse of discretion standard of review, a reporter's transcript or an agreed or settled statement of the proceedings is indispensable." (*Hood v. Gonzales* (2019) 43 Cal.App.5th 57, 79.) "The absence of a record concerning what actually occurred at the [hearing] precludes a determination that the trial court abused its discretion." (*Vo v. Las Virgenes Municipal Water Dist., supra*, 79 Cal.App.4th at p. 448.) Moreover, "Where no reporter's transcript has been provided and no error is apparent on the face of the existing appellate record, the judgment *must be conclusively presumed correct as to all evidentiary matters*. To put it another way, it is presumed that the unreported [hearing] testimony would demonstrate the absence of error. [Citation.] The effect of this rule is that an appellant who attacks a judgment but supplies no reporter's transcript will be precluded from raising an argument as to the sufficiency of the evidence." (*Fain, supra*, 75 Cal.App.4th at p. 992.)

Here, the record consists primarily of the trial court's statement of decision. The statement of decision notes Bhullar testified on behalf of HBA and three exhibits were admitted, but we do not know what Bhullar testified to and the three exhibits are not in

the record.[4]  Thus, unless error appears on the face of the statement of decision (or elsewhere in the record), Thach's arguments about incidental compensation are not cognizable.

A.  Relevant Law

"It is well established that the court has the power to award compensation incidental to a decree for specific performance, such as rents, when necessary 'to relate the performance back to the date set in the contract.' " (*Kassir v. Zahabi* (2008) 164 Cal.App.4th 1352, 1357.)  Such incidental compensation is *not* damages, although it is sometimes "incorrectly referred to" as such.  (*Rogers, supra*, 28 Cal.App.4th at p. 1221; see *id*. at pp. 1220-1221.)  " 'The concept of this monetary award to the buyer is *not* to give the buyer *damages* for the seller's breach of contract.  Rather, it is designed to relate the performance back to the contract date of performance and to adjust the equities between the parties because of the delayed performance by the seller.' " (*Stratton v. Tejani* (1982) 139 Cal.App.3d 204, 212 (*Stratton*).)  " '[W]here a purchaser of land is awarded the specific performance of his purchase contract, he is entitled to an allowance for what he has lost by reason of the vendor's delay in conveying the property. …  [I]f the court orders [the contract] to be performed, the decree must as nearly as possible order it to be performed according to its terms, and one of those terms is the date fixed by it for its completion.  This date having passed, the court in order to relate the performance back to it, equalizes any losses occasioned by the delay by offsetting them with money payments.  The true rationale of decision in respect of compensation for delay is that the contract is being enforced retrospectively and the equities adjusted accordingly.  In reality, therefore, the result is more like an accounting between the parties than like an assessment of damages.' " (*Bravo v. Buelow* (1985) 168 Cal.App.3d 208, 213.)  And

---

**4**      Although based on the description of the exhibits, they do not appear relevant to Thach's arguments regarding incidental compensation.

again: "Since the time for performance has passed, the court relates that performance back to that date, by treating the parties as if the change in ownership had taken place at that time.  Thus the buyer is entitled to the rents and profits from the time the contract should have been performed, and the seller is entitled to an offset for the interest on the purchase money which he would have received had the contract been performed."[5] (*Hutton v. Gliksberg* (1982) 128 Cal.App.3d 240, 248.)  The purpose of the incidental compensation award in this case was thus to restore the parties, as nearly as possible, to the financial position they would have been in had the sale gone through in September 2018.

Like specific performance itself, an award of incidental compensation is an equitable remedy governed by "equitable principles."  (*Stratton, supra*, 139 Cal.App.3d at p. 208.)  "[A] court of equity may exercise the full range of its inherent powers in order to accomplish complete justice between the parties."  (*People v. Superior Court* (*Jayhill*) (1973) 9 Cal.3d 283, 286.)  It has "broad equitable power to fashion any appropriate remedy," and is "permitted to consider any unjust or harsh result" in doing so.  (*Zarrahy v. Zarrahy* (1988) 205 Cal.App.3d 1, 4-5.)  An award of incidental compensation is a "matter[] for the exercise of the trial court's sound discretion, which we will not overturn absent a showing of abuse."  (*De Anza Enterprises v. Johnson* (2002) 104 Cal.App.4th 1307, 1315; see also *Petrolink, Inc. v. Lantel Enterprises* (2022) 81 Cal.App.5th 156, 166 [" 'When a trial court makes a ruling based upon equitable considerations, the abuse of discretion standard applies on review of that ruling' "].)

---

[5]     Although he would have been entitled to do so, it does not appear Thach sought such an offset.

24

B.  Lost Rental Income

Thach argues the lost rental income award was improper because (1) it effectively awarded compensation to a nonparty, and (2) the trial court abused its discretion in admitting evidence regarding lost rental income.

The trial court found Bhullar's plan was to use HBA to purchase the property and then transfer it to his mother, and his mother would then rent out the residential portion of the property.  The trial court also found that, after the parties complied with the order of specific performance, HBA "did in fact transfer the property to [Bhullar's] mother and she recently rented the residential portion for $3500 a month."  Finally, it found HBA was entitled to lost rental income of $3,500 a month from shortly after the time escrow was initially scheduled to close in 2018 to the date it actually closed in 2024, or $210,000.

Thach cites the rule that "a judgment may not be entered either for or against one who is not a party to an action or proceeding" (*Bronco Wine Co. v. Frank A. Logoluso Farms* (1989) 214 Cal.App.3d 699, 717), and he argues the lost income portion of the award must be reversed because it is effectively a judgment for Bhullar's mother, who is not a party to the lawsuit.  Thach acknowledges the judgment, like the statement of decision, awards incidental compensation to HBA, not to Bhullar's mother.  It thus does not technically run afoul of the rule that a judgment may not be entered for someone who is not a party to the action.  Thach argues, however, that the statement of decision makes it clear the purpose of the lost income portion of the award was to compensate Bhullar's mother for rental income she lost, and it thus effectively awarded incidental compensation to her.  Thach made this same argument in the trial court, and the trial court rejected it, as follows:  "Defendant argued that the court cannot award [lost rental income] because Ms. Kaur is not a plaintiff in this action.  The court disagrees.  The evidence shows that HBA was intended to be a conduit through which Mr. Bhullar would purchase the property for Ms. Kaur.  Mr. Bhullar and the other principal of HBA …

agreed that HBA would purchase the property in question for the benefit of Ms. Kaur. The purpose was to transfer the property to Ms. Kaur so that she could rent it. Defendant's actions frustrated this purpose. [¶] Moreover, defendant should not benefit simply because HBA planned to transfer the property to Ms. Kaur. HBA could have retained the property, let Ms. Kaur manage the property, and given her the rent. It would be inequitable to deny relief simply because the transaction was structured the way it was."

Thach never addresses (or even mentions) the actual basis for the trial court's ruling. "The burden of establishing trial court error and particularly an abuse of discretion falls squarely on the appellant." (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 89.) Even when the standard of review is de novo, the appellant still bears the burden of affirmatively demonstrating error. (See *Luo v. Volokh* (2024) 102 Cal.App.5th 1312, 1322; *Denny v. Arntz* (2020) 55 Cal.App.5th 914, 920.) Because he never mentions the basis for the trial court's lost income award, he fails to meet his burden of affirmatively demonstrating error. (See, e.g., *Cristler*, at pp. 89-90 ["If the appellant fails, as here, even to identify the specific testimony that was allegedly erroneously admitted, much less craft an argument intended to show why *that* testimony was both objectionable and sufficiently prejudicial to warrant reversal, the challenge must fail"].)

Moreover, and as noted above, when fashioning an equitable remedy like incidental compensation, the trial court is governed by "equitable principles" (*Stratton, supra*, 139 Cal.App.3d at p. 208); it may fashion an award that accomplishes "complete justice between the parties" (*People v. Superior Court* (*Jayhill*)*, supra*, 9 Cal.3d at p. 286); and it is "permitted to consider any unjust or harsh result" (*Zarrahy v. Zarrahy, supra*, 205 Cal.App.3d at p. 5). A trial court's discretion to fashion equitable relief is "broad." (*Estates of Collins & Flowers* (2012) 205 Cal.App.4th 1238, 1246.) As our Supreme Court explained over a century ago, "The powers of a court of equity … are not

26

cribbed or confined by the rigid rules of law. From the very nature of equity, a wide play is left to the conscience of the chancellor in formulating his decrees, that justice may be effectually carried out. It is of the very essence of equity that its powers should be so broad as to be capable of dealing with novel conditions." (*Bechtel v. Wier* (1907) 152 Cal. 443, 446; see also *Hartford Casualty Ins. Co. v. J.R. Marketing, L.L.C.* (2015) 61 Cal.4th 988, 1008 (conc. opn. by Liu, J.) [same].) Given all of this, we cannot say the trial court abused its discretion in awarding HBA lost rental income.

Thach also argues the trial court erred for various reasons when it admitted evidence of lost rental income at the hearing on incidental compensation. He expressly frames these arguments as challenges to "the trial court's decision to admit evidence regarding the alleged lost rental income," or to the "improper admission of evidence," or to the sufficiency of the evidence. Because Thach acknowledges these arguments are based on the admission of evidence at the hearing or the sufficiency of that evidence to support the trial court's findings, we reiterate that, without a transcript and unless the "error is apparent on the face of the existing appellate record," "the judgment must be *conclusively presumed correct* as to *all evidentiary matters*" and we must "presume[] that the unreported [hearing] testimony would demonstrate the absence of error." (*Fain, supra*, 75 Cal.App.4th at p. 992.) We thus address only those arguments that are cognizable without a transcript of the hearing.

Thach argues the trial court erred in allowing HBA to admit any evidence of lost rental income at the hearing on incidental compensation because HBA did not put on evidence of damages at trial. To support his argument, he cites a brief exchange between the court and HBA's counsel at the end of trial. The court stated, "I noticed you did not put on evidence of damages," and it asked, "Are you seeking specific performance only?" and HBA's counsel responded, "We're seeking specific performance." Thach's position appears to be that because HBA did not put on evidence of damages at trial, it "has no claim for any damages, including any claim for lost rental income," and the trial court

thus erred in admitting evidence of lost rental income at the subsequent hearing on incidental compensation. We disagree.

"Specific performance and damages are … alternative *remedies* for breach of contract." (*Rogers, supra*, 28 Cal.App.4th at p. 1218, fn. 2.) Because a party " 'may not obtain both specific performance and damages for the same breach of contract,' " it must ultimately elect which remedy to pursue. (*Union Oil Co. of California v. Greka Energy Corp.* (2008) 165 Cal.App.4th 129, 136.) HBA elected to pursue specific performance rather than damages (as evidenced by its counsel's exchange with the trial court), and it thus was not required to introduce evidence of damages at trial. (See *ibid.* [" '[T]he fact [the plaintiff] may have suffered no monetary damage would not defeat [the plaintiff's] right to specific performance' "].) However, the fact that HBA did not introduce evidence of damages at trial did not bar it from introducing evidence to support its request for incidental compensation at the subsequent hearing thereon. The lost income portion of the award was not damages for breach of contract. (See *Rogers*, at pp. 1220-1221.) Instead, it was compensation incidental to the decree of specific performance designed to put HBA in the position it would have been had Thach gone through with the sale in 2018. And as noted above, case law establishes a real property purchaser who is entitled to specific performance is generally also "entitled to the rents and profits from the time the contract should have been performed." (*Hutton v. Gliksberg, supra*, 128 Cal.App.3d at p. 248.)

Thach also argues $3,500 a month is speculative and/or too high for various reasons. Again, however, with no transcript of the hearing, we must presume the trial court's findings on that issue are supported by the evidence and it did not abuse its discretion. (*Fain, supra*, 75 Cal.App.4th at p. 992 ["an appellant who attacks a judgment but supplies no reporter's transcript will be precluded from raising an argument as to the sufficiency of the evidence"].)

28

Finally, Thach argues expert testimony is necessary to substantiate a claim of lost rental income but no expert testimony was proffered. To support his argument, he cites Evidence Code sections 720 to 723 (which deal with expert witnesses generally) and sections 800 to 870 (which deal with expert and other opinion testimony), with no further discussion. In particular, he does not explain how those sections apply to this case or support his argument. "It is the responsibility of the appellant, here [Thach], to support claims of error with meaningful argument and citation to authority. [Citations.] When legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration. [Citations.] In addition, citing cases [or statutes] without any discussion of their application to the present case results in forfeiture." (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) "The mere assertion of a statutory … violation, followed by simply a citation to the statute … , does not merit a judicial response." (*Woods v. Horton* (2008) 167 Cal.App.4th 658, 677.)

C. Increased Real Estate Agent Commission

Thach also argues the trial court abused its discretion in awarding HBA $21,400 of the commission it paid its real estate agent. We disagree.

HBA and its real estate agent entered into a written "buyer representation agreement" pursuant to which HBA agreed to pay its agent 3 percent of the property's acquisition price once the sale was complete. As the trial court found, the acquisition price was $850,000, and HBA thus owed its agent a $25,500 commission pursuant to the terms of the parties' agreement. As relevant here, the trial court also found as follows: "The evidence showed that [the agent] agreed in 2018 to reduce its commission to $4000. [HBA] and [Thach] had already agreed to pursue a sale before [the agent] was engaged, so it did not do any marketing and a typical closing was expected. The closing was prolonged, contentious, and ultimately unsuccessful. [¶] In connection with the 2024 Closing, [the agent] insisted on full payment of the commission … and that amount was paid by [HBA] out of escrow. … [¶] Had the sale closed in 2018, [HBA] would have

29

paid $4000. [HBA] is therefore entitled to the increase in the amount of commission that it was required to pay, which is $21,400."**6**

Thach argues this was improper because the buyer representation agreement provided it "may not be … modified … except in writing signed" by the parties, and he states in his brief that the evidence at the hearing showed HBA and its agent "orally modified" the agreement. With no transcript of the hearing, however, we do not know what evidence was admitted, much less what the evidence showed, and "[t]he trial court's findings of fact and conclusions of law therefore are presumed to be supported by substantial evidence and are binding upon us, unless … reversible error appears on the face of the record." (*Krueger v. Bank of America* (1983) 145 Cal.App.3d 204, 207.)

Even if we assume the trial court's finding that the agent "agreed in 2018 to reduce its commission to $4000" was based solely on evidence of an oral agreement, Thach fails to convince us the trial court erred in awarding HBA $21,400 to compensate it for the increase in commission it paid its agent. Thach's point appears to be that because the buyer representation agreement could only be modified in writing, HBA would have owed its agent the full $25,500 even if the sale had closed in 2018. We agree that, in a suit between HBA and its agent over the commission owed, the lack of a written modification *could* be fatal HBA's claim its agent orally agreed to reduce its commission to $4,000. (See, e.g., *Marani v. Jackson* (1986) 183 Cal.App.3d 695, 704-706.) But even then, it would not necessarily be fatal. For example, even where an agreement requires modifications to be in writing, " 'the parties may, by their conduct, waive such a provision' where evidence shows that was their intent." (*Biren v. Equality Emergency*

---

**6** The trial court's math appears to be off (the difference between $25,500 and $4,000 is $21,500, not $21,400) but neither party addresses the apparent error and neither will we.

30

*Medical Group, Inc.* (2002) 102 Cal.App.4th 125, 141.)  Perhaps such evidence was introduced at the hearing.

Moreover, this is not a suit between HBA and its agent over the commission owed. It is a suit between HBA and Thach for specific performance of the purchase agreement. Because the trial court awarded specific performance, it was also empowered to award incidental compensation " 'to relate the performance back to the date set in the contract.' " (*Kassir v. Zahabi, supra*, 164 Cal.App.4th at p. 1357.)  Thach fails to convince us the trial court abused its discretion in awarding HBA $21,400 in increased commission.

Finally, Thach argues that if HBA had sought damages for breach of contract rather than specific performance, it would not have been able to recover the $21,400 in increased commission it paid.  He cites the rule that damages for breach of contract "are generally limited to those within the contemplation of the parties when the contract was entered into or … reasonably foreseeable by them at that time" (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515), and he argues it was neither contemplated nor reasonably foreseeable that he would be required to pay HBA's agent's commission.  This may be true, but it is not relevant.  Again, "The compensation awarded as incident to a decree for specific performance is not for breach of contract and is therefore not legal damages." (*Ellis v. Mihelis* (1963) 60 Cal.2d 206, 219.)  And because it is not damages for breach of contract, "[c]ompensation as an incident to specific performance *need not be limited by contract concepts of foreseeability*, so long as said compensation is reasonable." (*Bravo v. Buelow, supra*, 168 Cal.App.3d at p. 215, italics added.)  Thus, whether or not HBA could have been awarded $21,400 for breach of contract is not relevant to the issue of whether the trial court could properly award that amount in order " 'to relate the performance back to the contract date of performance and to adjust the equities between the parties because of the delayed performance by the

31

seller.' " (*Stratton, supra*, 139 Cal.App.3d at p. 212.)  We find nothing unreasonable about this portion of the incidental compensation award.

## DISPOSITION

The judgment is affirmed and HBA shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


/s/
EARL, P. J.

We concur:


/s/
HULL, J.


/s/
MESIWALA, J.